Filed 6/25/13  Coalition for Adequate Review v. City/County of San Francisco CA1/1
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COALITION FOR ADEQUATE REVIEW et al.,<br><br>          Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>          Defendant and Respondent. | A131487<br><br>(San Francisco City & County<br>Super. Ct. No. CPF-08-508038) |

After preparing an environmental impact report, respondent City and County of San Francisco (city) approved a project to rezone land along the Market Street corridor near Octavia Boulevard and to redevelop 22 vacant parcels created by the removal of the elevated Central Freeway.  The city amended its general plan to include a new Market and Octavia Area Plan and conformed its planning code and zoning maps.  Plaintiffs Coalition for Adequate Review and Alliance for Comprehensive Planning filed a writ petition in the trial court challenging the city's amended general plan and environmental review of the project.  The trial court denied relief and we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Over 10 years ago, in December 2002, the city published *Market and Octavia Neighborhood Plan—Draft for Public Review*, an area plan proposing modified land use controls for an area loosely centered around the Market Street corridor near Octavia

1

Boulevard.  On January 23, 2004, the city gave notice it would, in compliance with the California Environmental Quality Act (CEQA), prepare an environmental impact report (EIR) evaluating the impacts of the area plan and redevelopment of 22 vacant parcels within the plan area created by the removal of the elevated Central Freeway.

On June 25, 2005, the city released its draft EIR.  The report states it "covers adoption of the [Area] Plan, amendments to the *San Francisco Planning Code* and *Zoning Maps,* amendment to the San Francisco General Plan, and adoption of urban design guidelines."  Aside from addressing redevelopment of the 22 Central Freeway parcels, the report does not review the impact of specific development projects that might occur within the area plan's boundaries.  Instead, "[i]ndividual projects that could occur in the future under the [area] Plan would undergo project level evaluation to determine if they would result in further impacts specific to the development proposal, the site, and the time of development and additional environmental review would be required."  The report identified potentially significant and unavoidable impacts, including shadows from possible new construction and increased traffic delays at several intersections.

The city solicited public comments on the draft EIR between June 25, 2005 and August 23, 2005.  On September 26, 2006, the city released a Comments and Responses document, which, together with the draft EIR made up the final EIR.

On April 5, 2007, the city planning commission certified the EIR, issued CEQA findings and a statement of overriding considerations, and recommended the city adopt the area plan and redevelopment project, despite their likely impacts, by enacting legislation to amend the city's general plan to include the area plan and amend the city's planning code and zoning map.  Plaintiffs appealed the EIR certification to the Board of Supervisors, which denied the appeal on June 19, 2007, by a vote of eight to one, with two abstaining.

On October 23, 2007, the Board of Supervisors approved the general plan amendment by ordinance No. 246-07. Later, on April 15 and 22, 2008, the Board approved the planning code and zoning map amendments.

Meanwhile, on January 22, 2008, plaintiffs filed a petition for writ of mandate in San Francisco Superior Court. Their first amended petition, filed May 30, 2008—after approval of the planning code and zoning map amendments, is the operative pleading. Plaintiffs alleged the city's general plan, after amendment by ordinance No. 246-07 to incorporate the Market and Octavia Area Plan, was unlawful because it lacked elements required by Government Code section 65302. They further alleged the Market and Octavia Area Plan created inconsistencies with the General Plan, in violation of Government Code section 65300.5[1] and San Francisco's Planning Code sections 101 and 101.1 (also known as Proposition M). Finally, they alleged the city's EIR for the Market and Octavia Area Plan was inadequate under CEQA. Plaintiffs prayed for a court order excising the Market and Octavia Area Plan from the general plan, voiding related changes to city codes and ordinances, and requiring the city to prepare a new general plan and new EIR before making any attempts to implement aspects of the Market and Octavia Area Plan.

Although challenges to a general plan should proceed expeditiously, and with preference, to trial within 90 days, this case took over two years to reach trial. (See §§ 65752 [preference]; 65753, subd. (a) [speedy trial].) Plaintiffs filed their opening memorandum in support of their petition on August 20, 2010. The city filed opposition on October 21, 2010, and plaintiffs filed a reply on November 19, 2010. After a day-long hearing on December 8, 2010, the trial court issued a brief written ruling, on December 15, 2010, denying the petition and requiring the city to submit a proposed

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

order.  The city subsequently submitted a 34-page, memorandum-format proposed order.  Over petitioner's objections, the trial court signed the proposed order on January 7, 2011—more than eight years after the city first published the draft area plan and about four and a half years since the final EIR was completed.  Plaintiffs filed a notice of appeal on March 7, 2011.

While the events giving rise to this litigation were unfolding, another case made its way through the courts, a case that challenged the adequacy of the 2004 housing element of the city's general plan—a replacement for the 1990 housing element.  The city had found the 2004 housing element would have no significant adverse environmental impacts and so issued a negative declaration and approved the element without preparing an EIR.  A court of this district, however, concluded "substantial evidence . . . support[ed] a fair argument that the amendments to the Housing Element may have a significant impact on the environment."  (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (Cal. Ct. App., June 22, 2007 (A112987) 2007 WL 1793881) at p. *1.)  The appellate court reversed and ordered the trial court "to issue a writ of mandate directing the City to set aside its adoption of the negative declaration and to order the preparation of an EIR."  (*Id.* at p. *14.)

On April 6, 2009, following this reversal, the trial court issued a preemptive writ of mandate.  It enjoined the city from implementing some aspects of the 2004 housing element, but allowed it to operate under the element's remaining provisions—many of which derived from the previous 1990 housing element—until the city complied with CEQA's mandates.  An April 29, 2009, letter from the state's Department of Housing and Community Development assured the city its gutted 2004 housing element still complied, in the department's opinion, with the state's planning laws.[2]

---

[2]  "If the Department finds the housing element substantially complies with housing element law, the housing element has a rebuttable presumption of validity.  (§ 65589.3.)"  (*Haro v. City of Solana Beach* (2011) 195 Cal.App.4th 542, 550.)

4

## II.   DISCUSSION

### A.   General Plan

"The Legislature has required every county and city to adopt 'a comprehensive, long-term general plan for the physical development of the county or city . . . .' (§ 65300.)  A general plan provides a ' "charter for future development" ' and sets forth a city or county's fundamental policy decisions about such development."  (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815.)

" '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.'  [Citation.]  'Since consistency with the general plan is required, absence of a valid general plan, or valid relevant elements or components thereof, precludes enactment of zoning ordinances and the like.'  [Citation.]  'The general plan consists of a "statement of development policies . . . setting forth objectives, principles, standards, and plan proposals."  [Citation.]  The plan must include seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address each of these elements in whatever level of detail local conditions require [citation].' "  (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1182.)

"The adoption or amendment of a general plan is a legislative act.  (Gov. Code, § 65301.5.)  A legislative act is presumed valid, and a city need not make explicit findings to support its action.  [Citations.]  A court cannot inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions.  [Citation.]  Judicial review of a legislative act under Code of Civil Procedure section 1085 is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair.  [Citations.]"  (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195 (*Federation*).)  "[O]nly those portions of the general plan which are impacted or influenced by the adoption or amendment can properly be challenged in the action which

5

is brought." (*Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 289–290, overruled in part on another ground as stated in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11.)[3]

Plaintiffs challenge the city's general plan as deficient because it lacks an adequate land use element, circulation element, and housing element.

### 1.    Land Use Element

Section 65302 requires a general plan to include a "land use element that designates the proposed general distribution and general location and extent of the uses of the land for housing, business, industry, open space, including agriculture, natural resources, recreation, and enjoyment of scenic beauty, education, public buildings and grounds, solid and liquid waste disposal facilities, and other categories of public and private uses of land." (§ 65302, subd. (a).)

---

[3] In their petition for rehearing, plaintiffs clarified and emphasized one of their arguments concerning the city's general plan—that the plan's land use element, circulation element, and housing element were all *inadequate before amendment*. Plaintiffs, however, did not timely challenge, in this case, the adequacy of the pre-amendment general plan. In response to California's "crisis"-level housing shortage and to "provide certainty for property owners and local government" (§ 65009, subds. (a)(1), (a)(3)), the Legislature has required challenges to the adequacy (as opposed to the existence) of general plan elements to be made within 90 days, (*id.*, subds. (c)(1)(A)). A plaintiff cannot use the occurrence of a general plan amendment to challenge the adequacy of any long-standing portions of that plan. Such challenges are time barred. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 387–389; *Garat v. City of Riverside*, *supra*, 2 Cal.App.4th at p. 290 ["This requirement of some sort of nexus of relevancy between the direct object of the challenge (e.g., an amendment to a general plan) and the overall reach of the challenge (e.g., those portions of the general plan being amended or impacted by the amendment) is hardly startling and has been recognized in other contexts by other courts."].) A contrary rule would chaotically upend the very certainty and confidence the statute explicitly seeks to promote. We may still, however, address plaintiffs' contentions that certain general plan elements were entirely absent, or that the 2007 general plan amendments were inadequate.

Plaintiffs contend the city's general plan, after amendment with the Market and Octavia area plan, has no land use element at all. While the general plan does lack a single land use element, it contains a "Land Use Index" which refers the reader to other parts of the plan containing information that, if located in one place, would make up the land use element. The Market and Octavia Area Plan, as well as other area plans, also contains land use information. Such a distributed approach to the land use element is acceptable. A "general plan may be adopted in any format deemed appropriate or convenient by the legislative body, including the combining of elements." (§ 65301, subd. (a).) In addition, a "general plan may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area."[4] (§ 65301, subd. (b).)

Plaintiffs next contend the land use element, as amended, fails to "include a statement of the standards of population density and building intensity recommended for the various districts and other territory covered by the plan." (§ 65302, subd. (a).)

Yet the Land Use Index has a section labeled "Population Density and Building Intensity Standards." The section points to density and intensity standards in the commerce and industry and housing elements, and the various area plans. It also has a series of maps. They depict citywide guidelines for building height and building bulk, and depict a citywide commercial and industrial density plan, which expresses densities in terms of a FAR (Floor Area Ratio), the ratio between gross floor area to lot area.

In addition, the Market and Octavia Area Plan states there should be no limit on population density within that already-established urban area, because the goal is to maximize housing and limits would "unnecessarily constrain the housing potential." The

---

[4] Plaintiffs' rehearing petition suggests, for the first time, that the Land Use Index may not be part of the city's general plan. They present no evidence of this. Furthermore, plaintiffs made no such argument in their appellate briefing, even though the city relied heavily on its Land Use Index in its respondent's brief.

7

plan states it would be preferable to regulate building height, bulk, and other design characteristics to promote building design goals, not density per se.

To that end, the area plan divides the Market and Octavia neighborhood into use districts. A map, labeled map 1, shows the districts' locations and a table, labeled figure 3, establishes permitted uses for each district. For example, the Van Ness and Market Downtown Residential Special Use District (VNMDR-SUD), occupying the area by the intersection of those two streets, "will still have the area's most intensive commercial uses, including offices, but balances those with a new residential presence." Mixed office, retail, and housing are allowed in an 85- or 120-foot building base, with residential towers permitted above the base at heights ranging from 160 to 400 feet. Although there would be, explicitly, no limit on residential density, there is a minimum 2:1 residential to non-residential use ratio. Certain retail, office, and cultural uses are permitted up to the fourth floor. No minimum residential or non-residential parking is required, but residential off-street parking is allowed at .25 spaces per unit (up to .75 spaces per unit and 1 space per two-bedroom unit by conditional use permit) and non-residential parking is allowed at approximately 1 space per 4,500 gross square feet.

On the other end of the spectrum is the Residential Transit Oriented (RTO) district, which comprises less-dense pockets of the planned area. The RTO district "will encourage moderate-density, multi-family, residential infill, in scale with existing development" near robust transit infrastructure, with allowance for limited small-scale retail. Non-retail offices are not allowed, but retail on corner lots, up to 1,200 square feet, is. Residential density is limited at one unit per 600 square feet lot area, with conditional use permits available for a higher density. Forty percent of units must be two-bedroom units unless an exception is made. There may be a maximum of .75 off-street parking spaces per residential unit; up to one space with a conditional use permit.

8

Other area plan districts, falling between these two, are fleshed out similarly in the plan document.[5]

Plaintiffs cite no authority suggesting the foregoing do not constitute a sufficient "statement of the standards of population density and building intensity recommended for the various districts and other territory covered by the plan." (§ 65302, subd. (a).)

While one "reasonable interpretation of the term 'population density' as used in Government Code section 65302 is one which refers to numbers of *people* in a given area" (*Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 699 (*Twain*)), the area plan undoubtedly offers "standards of population density," even if the standard is unlimited density (within other constraints). Unlimited density is no less a standard than limited density, and it is a choice the city reached quite deliberately. Its policy 2.2.1 on page 15 of the area plan calls for elimination of density maximums, which "unnecessarily constrain the housing potential . . . in relatively dense, established urban neighborhoods like the Market and Octavia area." Plaintiffs may debate the policy of having unlimited density constrained by other limits on development, but our task is not to evaluate the wisdom of the general plan, only its compliance with the law. (*Federation*, *supra*, 126 Cal.App.4th at p. 1195 [we do not "inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions"].)

As to standards for building intensity, the area plan document gives standards for building heights and permitted uses for each zoning district in the area, precisely the sorts of standards called for in *Twain*, *supra*, 138 Cal.App.3d 664, 699 [standards might

---

[5] The general plan also contains a table, labeled I-27, that correlates certain extant zoning districts with average units and persons per acre. The parties dispute whether this table meets the obligations of general plan, rather than zoning guidelines, to specify population density standards for the Market and Octavia area. We need not resolve this dispute in light of the conclusions we reach below.

9

include "restrictions such as height or size limitations, restrictions on types of buildings or uses to be permitted within a designated area"].)

### 2. Circulation Element

A general plan must also contain a "circulation element consisting of the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, any military airports and ports, and other local public utilities and facilities, all correlated with the land use element of the plan."  (§ 65302, subd. (b)(1).)  Correlation means "the circulation element of a general plan must provide meaningful proposals to address changes reflected in the land use element, and the land use element must provide meaningful proposals to reflect changes reflected in the circulation element." (*Federation*, *supra*, 126 Cal.App.4th at p. 1196.)

Plaintiffs believe correlation is lacking because the Market and Octavia land use plan calls for increased density while the circulation plan calls for relatively fewer parking spaces (compared to other parts of the city) and a balanced use of city roadways. The area plan, however, addresses this supposed conundrum.  It recognizes "[a] common fear is that reducing the capacity available for cars will result in major increases in congestion."  Yet notes "[m]uch research rejects this logic and shows that people's transportation choices are dynamic and respond to capacity, relative cost, time, convenience, and other factors" and "[c]rucially . . . movement of people is more than just movement of cars."

Plaintiffs may dislike this correlation, but there *is* undoubtedly correlation.  Only time will tell if the city's "if we build it" approach to parking and transportation choices will benefit the Market and Octavia area.  Meanwhile, the conclusion reached in *Federation* is apt here:  "Contrary to [Plaintiffs'] argument, the internal consistency and correlation requirements do not require a city or county to limit population growth or provide traffic management measures to ensure that its transportation infrastructure can accommodate future population growth.  The Planning and Zoning Law (Gov. Code,

10

§ 65000 et seq.) does not require a city or county to avoid adverse impacts on transportation. Rather, the city has broad discretion to weigh and balance competing interests in formulating development policies, and a court cannot review the wisdom of those decisions under the guise of reviewing a general plan's internal consistency and correlation." (*Federation*, *supra*, 126 Cal.App.4th at p. 1196.) Accordingly, we shall not disturb the circulation element.[6]

### 3. Housing Element

Plaintiffs claim, because of the June 2007 decision of this court in *San Franciscans for Livable Neighborhoods v. City and County of San Francisco*, *supra*, 2007 WL 1793881, the city lacked a valid housing element at the time it amended its general plan in October 2007 to include the Market and Octavia Area Plan. Plaintiffs also contend the trial court's eventual writ in that case, issued April 6, 2009, specifically enjoined the city from enforcing, relying upon, or approving any " 'no residential parking requirement' " or " 'no density requirement[] for residential projects' " until those policies received environmental review.

The 2007 Court of Appeal decision did not invalidate the city's then-existing housing element. That decision merely commanded the trial court to issue a writ "to order the preparation of an EIR" for the 2004 revisions to the previously-approved, and EIR-vetted, 1990 residency element. (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco*, *supra*, 2007 WL 1793881, at pp. *1, *14.) When the trial court eventually issued a writ in 2009, it explicitly allowed the city to rely on the 1990 residency element and certain valid portions of the 2004 housing element until the city could conduct environmental review for, and approve, a new housing element. (See § 21168.9 [writs shall "include only those mandates which are necessary to achieve

---

[6] Plaintiffs also argue the circulation elements is "perforce invalid" because the land use element is deficient and cannot be correlated with it. As we have upheld the land use element, this argument fails.

11

compliance with this division and only those specific project activities in noncompliance with this division"]; *Federation of Hillside and Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1266.)

In fact, as of August 2007, the city, aware of the Court of Appeal decision, augmented its consistency findings for the Market and Octavia area plan such that it not only found the area plan consistent with the 2004 housing element, but also the 1990 residence element. Thus, when the city amended the general plan in October 2007, it operated with a housing element in place.

Even if the 2009 writ forbade the city from adopting certain parking and density policies in its housing element absent further environmental review, it did not, retroactively, forbid the city from adopting, in October 2007, an area plan with similar housing policies for one area of the city, Market and Octavia, following the *exact sort of extensive CEQA-compliant environmental review* (discussed below) the writ demanded. Plaintiffs do not offer a cogent argument for why the city could not make this incremental change to its housing element if it proceeded according to CEQA's dictates.

Further, it appears the city has since completed review of and approved the 2004 housing element, and a subsequent 2009 housing element.[7] Thus any arguable consistency issues between the area plan and the 1990 residence element have been

---

[7] We previously denied the city's request for judicial notice of the ordinance adopting the revised housing element. The city had grouped it amongst a number of other documents outside the administrative record and post-dating the city's approval of the Market and Octavia area plan. We now take judicial notice pursuant to our own motion. (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 647, fn. 13 [taking judicial notice of ordinance on court's own motion].) Given the document pertains to mootness, not the propriety of agency action, it is relevant and taking judicial notice for the purpose of providing an alternate basis for our ruling does not run afoul of *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 574, footnote 4. We need not and do not draw any conclusion about the adequacy of the city's operative housing element, we have only noted plaintiffs cannot assert inconsistencies with a now-supplanted 1990 residence element.

12

eliminated and, to this extent and in this case, the housing element issue is moot. (*Davis v. Superior Court* (1985) 169 Cal.App.3d 1054, 1061 [if objections to a housing element "have been remedied, the issues will then be moot"]; *Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644, 648 ["While the appeal was pending before this court, the board of supervisors amended the zoning for Rancho Del Dios to conform to the general plan, thus mooting the principal issue of this appeal."].)

**B.    CEQA**

"CEQA requires that an EIR include detailed information concerning, among other things, the significant environmental effects of the project under consideration. (Pub. Resources Code, §§ 21100, 21100.1)" (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 923–924 (*Rialto*).)  " 'The EIR is the heart of CEQA' and the integrity of the process is dependent on the adequacy of the EIR." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117.)

" ' " '[A]n EIR is presumed adequate (Pub. Resources Code, § 21167.3), and the plaintiff in a CEQA action has the burden of proving otherwise.' " ' (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836 . . . .)  In CEQA cases, as in other mandamus cases, 'we independently review the administrative record under the same standard of review that governs the trial court.' (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 . . . ; accord, *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 . . . (*Vineyard*).)  We review an agency's determinations and decisions for abuse of discretion.  An agency abuses its discretion when it fails to proceed in a manner required by law or there is not substantial evidence to support its determination or decision.  ([Pub. Resources Code,] §§ 21168, 21168.5; *Vineyard, supra,* 40 Cal.4th at pp. 426–427.)  'Judicial review of these two types of error differs significantly:  While we determine de novo whether the agency has

13

employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' (*Vineyard,* at p. 435.)" (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275 (*Santee*).)

"Consequently, in reviewing an EIR for CEQA compliance, we adjust our 'scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.' (*Vineyard, supra,* 40 Cal.4th at p. 435.) For example, where a petitioner claims an agency failed to include required information in its environmental analysis, our task is to determine whether the agency failed to proceed in the manner prescribed by CEQA. Conversely, where a petitioner challenges an agency's conclusion that a project's adverse environmental effects are adequately mitigated, we review the agency's conclusion for substantial evidence. (*Vineyard,* at p. 435.)" (*Santee*, *supra*, 210 Cal.App.4th at p. 275.)

"Substantial evidence for CEQA purposes is 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' (Guidelines,[8] § 15384, subd. (a).) Substantial evidence includes 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' (*Id.*, subd. (b).) It does not include argument, speculation, unsubstantiated opinion or narrative, clearly erroneous or inaccurate evidence, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment. (*Id.*, subd. (a).)" (*Santee*, *supra*, 210 Cal.App.4th at pp. 275–276.)

---

[8] All references to Guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). "The Guidelines are developed by the Office of Planning and Research and adopted by the Secretary of the Resources Agency. (§ 21083; *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 465, fn. 4 . . . .) 'In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' (*Vineyard*, *supra*, 40 Cal.4th at p. 428, fn. 5.)" (*Santee*, *supra*, 210 Cal.App.4th at p. 276, fn. 10.)

" 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' (*Vineyard, supra,* 40 Cal.4th at p. 435; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, [392–]393 . . . .) Rather, we must resolve any reasonable doubts and any conflicts in the evidence in favor of the agency's findings and decision. (*Laurel Heights,* at p. 393; *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 522–523.)" (*Santee*, *supra*, 210 Cal.App.4th at p. 276.)

Further, " '[i]n determining the adequacy of an EIR, the CEQA Guidelines look to whether the report provides decision makers with sufficient analysis to intelligently consider the environmental consequences of a project. ([Guidelines,] § 15151.) The CEQA Guidelines further provide that "the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible . . . . The courts have [therefore] looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." ([Guidelines] § 15151.)' [Citation.] The overriding issue on review is thus 'whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public to discern from the [EIR] the "analytic route the . . . agency traveled from evidence to action." [Citation.]' [Citation.]" (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262.)

Plaintiffs assert numerous defects in the city's CEQA review.

### 1. Project Description

"An accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193.)

### Boundaries

Plaintiffs first assail the EIR's project description for not reflecting shifts in the project's boundaries over time, such that the project description ultimately failed to disclose the project's "precise location . . . on a detailed map." (Guidelines, § 15124, subd. (a) [setting forth requirements for an EIR's project description].)

In reality, section 3.3 of the draft EIR defines the project location by providing the names of bordering streets, the numbers of 89 included Assessor's Blocks, and a map. In the September 2006 response to comments, the city reduced the project area by about 12 blocks—stating those blocks would be covered by other area plans—and provided a new map showing the change. The city concluded this small reduction in project size "would have either comparable or less impacts relative to the Plan analyzed in the DEIR."

The project description should be stable and " '[t]he defined project and not some different project must be the EIR's bona fide subject.' " (*Western Placer Citizens for an Agriculture & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898.) Nonetheless, " '[t]he CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal.' (*County of Inyo v. City of Los Angeles*[, *supra*,] 71 Cal.App.3d 185, 199–200 . . . ." (*Ibid.*) Put another way, "CEQA does not handcuff decisionmakers . . . .)" (*Dusek v. Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1041.) "The action approved need not be a blanket approval of the entire project initially described in the EIR. If that were the case, the informational value of the document would be sacrificed. Decisionmakers should have the flexibility to implement that portion of a project which satisfies their environmental concerns." (*Ibid.*) Thus, in *Dusek*, when a project description (redevelopment of a parcel) was broader than, but inclusive of, the project approved (demolition of a structure on the parcel), the public was fully informed and had an opportunity to voice opposition. (*Id.* at pp. 1035, 1041.)

16

The city's choice, here, to *reduce* the size of the plan area makes this case like *Dusek*.[9] The city's EIR addressed a plan broader, and with greater impacts, than the plan approved. Plaintiffs dispute this, stating the city's plan would still increase housing and residency, but now distribute that growth more intensely over a smaller area. Not so. While the plan states fixed population growth targets, these targets are mere aspirations, not mandatory. The plan quite plainly seeks population growth through zoning change. Thus, the city's rezoning of fewer parcels would in fact reduce the plan's impacts.[10]

### *Description of VNSUD*

Plaintiffs further claim the EIR omits a description of the VNMDR-SUD (standing for Van Ness and Market Downtown Residential Special Use District), and that this district was only added to plans after EIR certification.

Though the draft EIR did not use the VNMDR-SUD acronym, it does describe the project as creating a "Downtown Residential" (DTR) district "around the Market Street and Van Ness Avenue intersection." This district "would permit . . . moderate- and large-sized commercial activities" up to the fourth floor. "[A]utomobile-oriented uses would not be allowed." Height limits—from 160 feet up to 400-foot towers would be allowed—and bulk limits would determine housing density. Thus, the EIR foreshadowed and accounted for the "huge towers already in the Planning process" plaintiffs oppose. The draft EIR also provides a table, labeled 3-1, of characteristics of the DTR district and

---

[9] Plaintiffs argue *Dusek* is inapposite, because it concerned a project-level supplemental EIR, not a "defective EIR." This argument, which plaintiffs flesh out no further, lacks discernable logic.

[10] Other, later "changes" to the Market and Octavia area plan are inconsequential and have no bearing on CEQA compliance. There appears to have been a clerical error, by which the city approved a version of the plan with even fewer zoning changes than called for in the final EIR, and then later fixed this error in a later ordinance. There is no dispute the EIR addressed the full range of potential zoning changes and that the city eventually implemented all of them, excluding the 12 blocks mentioned above. Plaintiffs have not shown how there was any cognizable defect under CEQA.

17

other proposed districts—a table that mirrors the table in the draft Market and Octavia Area Plan, labeled figure 3 and discussed above. It restates, for the DTR district, the commercial activity and height restrictions, and states there will be no minimum parking required, but that there could be up to 1 commercial spot per 4,500 square feet and from .25 spaces (up to .5 spaces with conditional use permit) per residential unit. The draft EIR discusses impacts related to the DTR's creation in section 4.2.2.

Comparing the draft EIR's DTR district to the VNMDR-SUD found in the approved Area Plan, there is almost no difference. It appears city planners changed the name of district that would cover the Van Ness and Market intersection, but little else. There are some differences. For example, the VNMDR-SUD allows somewhat more residential parking (.75 spaces by conditional use permit rather than .5). But these changes are noted and addressed in the response to comments. As for the additional parking that would be allowed under the revised project, the city's response states the EIR evaluated a range of allowed parking—from zero to one space per unit—and therefore no further analysis of the change was needed.

The public was on notice about the DTR and the VNMDR-SUD, and plaintiffs cannot complain about, in essence, a name change and minor tweaks arising from the public comment process.

### 2. EIR Tiering

Plaintiffs next raise a concern about the EIR's limited scope—that is, the city's choice to segregate and postpone review of various endeavors, which plaintiffs argue should have been reviewed in the EIR under consideration.

The city's EIR delineated three types of proposed endeavors and handled each type differently. It analyzed the Market and Octavia Area Plan's proposed land use changes at a "Program Level," without addressing specific possible future developments that might come to be on rezoned parcels. It analyzed near-term projects referenced in the Area Plan—redevelopment of the 22 Central Freeway parcels and conversion of

18

Hayes and Fell to two-way streets—at a "project level." The EIR also mentioned long-term transportation initiatives mentioned in the Area Plan, but did not analyze these because, as it concluded, the city was not seeking approval for these initiatives, which would be subject to additional environmental review when proposed.

Plaintiffs fault the EIR for treating land use changes at a "program level" and for not addressing the long-term transportation initiatives.

A program-level EIR "is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related" by geography, by being "logical parts" in a chain of contemplated action, by "issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program," or by being "under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Guidelines, § 15168, subd. (a).)

Program EIRs play a key role in "tiered" CEQA analysis. (Guidelines, § 15152, subd. (h).) " 'Tiering' refers to using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project." (Guidelines, § 15152, subd. (a).) The Legislature has declared "environmental impact reports shall be tiered whenever feasible." (Pub. Resources Code, § 21093, subd. (b); *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740.) Tiering "will promote construction of needed housing and other development projects by (1) streamlining regulatory procedures, (2) avoiding repetitive discussions of the same issues in successive environmental impact reports, and (3) ensuring that environmental impact reports prepared for later projects which are consistent with a previously approved policy, plan, program, or ordinance concentrate upon environmental effects which may be mitigated or

19

avoided in connection with the decision on each later project." (Pub. Resources Code, § 21093, subd. (a).)

The CEQA Guidelines specifically endorse tiering "in connection with an EIR for a large-scale planning approval, such as a general plan or component thereof (e.g., an area plan or community plan)," noting in these cases, "development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of a more limited geographical scale." (Guidelines, § 15152, subd. (c); see *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1174–1175 (*In re Bay-Delta*) ["Under CEQA's tiering principles, it is proper for a lead agency to use its discretion to focus a first-tier EIR on only the general plan or program, leaving project-level details to subsequent EIR's . . . ."]; *id.* at p. 1176 ["an EIR on a construction project will necessarily be more specific than an EIR on the adoption or amendment of a comprehensive zoning ordinance or a local general plan"].)

The city's programmatic treatment of land use changes, deferring analysis of specific development projects, was entirely consistent with CEQA. (*In re Bay-Delta*, *supra*, 43 Cal.4th at pp. 1174–1176; *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 929 [approving a site-specific EIR tiered atop a broader area EIR]; *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners*, *supra*, 18 Cal.App.4th at p. 743 [first-tier EIR adequate when it analyzes goal of increased port capacity while deferring full analysis of anticipated projects, discussing them only "for the purposes of giving a reasonably detailed consideration to the overall five-year plan"]; *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 374 ["Thus, an EIR on the adoption of a general plan, such as is under scrutiny here, must focus on secondary effects of adoption, but need not be as precise as an EIR on the specific projects which might follow."]; *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1337 ["We do not believe that the EIR required in this case must

20

describe in detail each and every conceivable development scenario. All it must analyze are the road and utility impacts in relation to the most probable development *patterns.*"], italics added.)

The cases plaintiffs cite are unhelpful to them. *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182 (*Stanislaus*), makes the same distinction between zoning and development projects as the cases just cited. In criticizing an EIR for a 25-year, phased project for a golf resort community, the Court of Appeal was concerned the report disclosed a water plan sufficient to cover only the first five years of the project, and deferred consideration of impacts related to future water needs until the project was well underway—and in need of water. (*Id.* at pp. 188, 195.) This was not a case where the county "*simply adopt*[*ed*] *or amend*[*ed*] *a general plan so as to permit the building of homes and golf courses.* The County adopted a specific plan calling for the construction of those facilities and of other particularly described facets of the Diablo Grande Specific Plan." (*Id.* at p. 203, italics added; see also *Vineyard*, *supra*, 40 Cal.4th at p. 431 [agreeing with result in *Stanislaus*].)

*Laurel Heights*, *supra*, 47 Cal.3d 376, is also distinguishable. That case involved UCSF acquiring a building which it planned to eventually use all of, but which it would use only a portion of until current tenants' leases expired. UCSF could not avoid an EIR that addressed use of the whole building, since UCSF conceded it would in fact make that full use. (*Id.* at pp. 388, 393, 397.) The project in *Laurel Heights* did not implicate the planning and implementation dichotomy we have here (*id.* at p. 396 ["This is not the type of situation where it is unclear as to whether a parcel of land will be developed or as to whether activity will commence."]), but concerned, like *Stanislaus*, inevitable future "phases" of projects to be carried out by the same proponents of the initial projects.

Thus, no authority required the city to analyze, in connection with an area plan EIR, the specific development projects that might or might not occur on every parcel within the area, including private development projects by untold numbers of third-party

21

developers. Analysis of such development may be left to the future and may piggbyback on the programmatic area plan EIR.

Following from this, the city also did not need to study "in-the-pipeline" projects (already subject to their own CEQA and EIR process) located within the confines of, and consistent with, the area plan, such as the planned development of 500 residential units at a former UC Berkeley site at 55 Laguna (the LHBHSUD district) or the construction of a grocery store at 555 Fulton (the Fulton SUD). The city in fact conducted environmental review of the 55 Laguna redevelopment project, and in 2010 a Court of Appeal concluded that review was adequate.[11] (*Save Laguna Street Campus v. City and County of San Francisco* (Cal. Ct. App., May 25, 2010, A124531) 2010 WL 2059470.) Also, the city adopted a mitigated negative declaration when approving the 555 Fulton project. This case is not akin to *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 67, 73–74 and footnote 2, in which the city simultaneously pursued four downtown high-rise projects and produced EIRs for each project that unlawfully ignored the likely impacts of the other three. That case did not involve tiering development projects atop broader land use planning, which is what the city has done here. In no sense has the city " 'precluded informed decisionmaking and informed public participation.' " (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898.)

Finally, the city was free to postpone analysis of future, hypothetical transportation initiatives that were not planned for implementation. The city was free to

---

[11] In any event, the EIR does discuss the cumulative impacts of the 55 Laguna project with the Market and Octavia plan on, at a minimum, pages 4-61 to 4-62, and 4-207, and in the response to comments at page 3-139. A city pre-approval memorandum responding to public comments further discusses cumulative impacts from the project. Plaintiffs have acknowledged the memorandum, yet take no issue with its conclusion that the alleged harm to historic resources from development at 55 Laguna would not have a negative impact cumulatively with the Market and Octavia Area Plan project.

decline implementation of these changes, and could decline study of them as they were not inevitable outgrowths of adopting the Area Plan's land use changes. (See *Laurel Heights*, *supra*, 47 Cal.3d at p. 396; *Stanislaus*, 48 Cal.App.4th at p. 203.) That is, the city could adopt the zoning changes and not have, in the language of *Stanislaus*, a half-built resort on its hands.

### 3. Baseline

"To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 (*Communities*).) "Section 15125, subdivision (a) of the CEQA Guidelines provides: 'An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.' [Citation.]" (*Id.* at p. 320, italics omitted.)

### *Historic Resources Baseline*

Plaintiffs criticize the EIR's treatment of historic resources, claiming it omits a discussion of certain historic buildings and thereby impedes the public's understanding of impacts to them.

Section 4.6.3 of the EIR summarizes architectural resources within the Market and Octavia neighborhood. It draws on eight surveys from between 1968 and 2004, plus the city planning department's Parcel Information Database. It notes hundreds of structures "contribute" to historical districts, such as the Hayes Valley Historic District, or have unique architectural or historical features, such as Mission Dolores and a U.S. Mint

23

building.  The EIR notes infill development promoted by the area plan could differ in design and scale from historical resources, thus altering the context in which those resources exist.  On the other hand, a goal of the area plan is preservation of historic buildings and the plan's urban design guidelines "would ensure that new development enhances the area's physical fabric."  "Individual projects proposed within the [neighborhood] would be subject to existing city land use controls including design review during the permitting stage to ensure compatibility with adjacent historical resources [and] to avoid demolition of historic resources."  These controls and reviews would, claims the EIR, prevent significant impacts at the program level, but "[s]ite specific impacts would need to be evaluated for individual projects before they are approved."

Thus, despite plaintiffs' claim of EIR omissions, the EIR does mention "omitted" buildings by name (such as the U.S. Mint) or acknowledge them by reference to a group to which they belong (the Tudor on Waller street is one of the 200 structures "contributing" to the Hayes Valley Historic District).  Having laid out in broad strokes the historical resources in the Market and Octavia area, the EIR alerts the public that the area contains historic structures and promises further environmental review should any actual development plans threaten those structures.

This level of detail is sufficient for the program-level EIR at issue.  Separate, project-level review of specific developments will inform the public of impending changes to historic resource, and the impacts of those changes, including those impacts that would be cumulative with other projects.  To hold otherwise would defeat the tiering process authorized by the CEQA Guidelines.  (See *In re Bay-Delta*, *supra*, 43 Cal.4th at pp. 1174–1176.)  As each historic resource is unique, to insist on further review now, at the program level, would not be cost-effective and could bind the city to a course of action that it later found to be infeasible.

Moreover, the promise of later, second-tier review is not an empty one, but rather a promise courts accept, and will enforce, in the context of an appropriately tiered EIR. (See *In re Bay-Delta*, *supra*, 43 Cal.4th at pp. 1174–1176; *Natural Resources Defense Council, Inc. v. City of Los Angeles* (2002) 103 Cal.App.4th 268, 282 ["A program EIR does not always suffice for a later project."].)

Nonetheless, plaintiffs are particularly concerned that new 400-foot towers could, if approved according to the area plan, block views of City Hall, whose spire reaches only 300 feet. First, as the EIR discusses, the area around City Hall already has three high-rise towers and a maximum permitted height of 320 feet, which minimizes the impact of the feared changes to city views. (Cf. *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 560-561 [existing conditions are part of the baseline].) Second, as already discussed, future project-level reviews of the actual buildings that will populate the area plan will protect particular resources, such as City Hall.

### *Traffic Baseline*

*2006 Octavia Study.* First, plaintiffs fault the city for not including in the traffic baseline the latest data about the new, six-lane Octavia Boulevard freeway access road, even though the road opened in September 2005, after the public comment period but before the area plan's EIR was finalized. They cite a March 2, 2006 city study, not cited in the EIR, showing use of Octavia was then already close to capacity and resulting in congestion on nearby feeder streets.

But the city's draft EIR had accounted for increased use of Octavia as a freeway feeder, noting "a wide variation in terms of percent contribution at several of the study intersections . . . as future traffic volumes would be affected by implementation of the Central Freeway Project." While "future traffic volume" at some intersections "would be reduced due to the reassignment of vehicles . . . [to] new on- and off-ramps," the city

more than doubled the estimated use of the Market/Octavia/McCoppin intersection, the new ramp location, even without the plan.

Then, when plaintiffs complained in late 2005 during the comment process about the lack of an evaluation of current Octavia Boulevard conditions, the city responded with information and action. In its September 2006 response, it told plaintiffs that the Octavia/Market freeway "touchdown" had been approved after environmental review in 2000. The city also collected new traffic data in "November 2005 to determine actual shifts in traffic patterns related to" the freeway access changes, data it included with its comment responses. The city also took stock data collected in October and December 2005, and concluded "the volume estimates [from the draft EIR] are consistent with actual traffic volumes after the ramps and boulevard were opened."

The city can only analyze the environmental baseline existing at the time of its review. (*Communities, supra,* 48 Cal.4th at p. 321.) The city here used the data available to it and supplemented its analysis after collecting new data in response to comments. Plaintiffs have faulted the city for not incorporating still more-recent data on traffic, available only months after the public comment period had closed, and making yet another review of traffic impacts. At some point, however, review must end. " ' " 'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' " ' " (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 385–386.) The city's efforts here were adequate.

*Year 2025 "baseline".* Plaintiffs next claim the EIR improperly uses hypothetical conditions in the year 2025 as a baseline for measuring traffic impacts. The EIR does indeed compare expected traffic impacts with and without the plan in the year 2025. It also, however, contains information about actual, observed traffic conditions in the plan area, including data from 32 intersections collected by Wilbur Smith & Associates in

26

2004 and the supplemental data collected in late 2005 already discussed.[12]  In fact,
Appendix C to the draft EIR has a chart that compares *current* intersection traffic with
projected traffic in 2025, both with and without the plan, giving a grade between A and F
to each intersection in each scenario, with E and F representing unsatisfactory conditions.
Such information provides a sufficient traffic baseline, and plaintiffs have not met their
burden to show otherwise.  (*Pfeiffer v. City of Sunnyvale City Council* (2011)
200 Cal.App.4th 1552, 1572 (*Pfeiffer*).)

      "This court's decision in *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale
City Council* (2010) 190 Cal.App.4th 1351 . . . (*Sunnyvale West*), on which [plaintiffs]
rely, does not compel a different conclusion.  The decision in *Sunnyvale West* involved a
CEQA challenge to the city council's approval of the proposed Mary Avenue extension
project.  (*Sunnyvale West*, at p. 1358.)  The trial court granted a peremptory writ of
mandate setting aside the approval on the ground that the baseline used to measure traffic
impacts was 'projected traffic conditions in the year 2020,' and the final EIR did not
consider 'the project's traffic and related impacts on the existing environment.'  (*Ibid.*)
This court affirmed, finding that the city had erred in when it 'chose the projected
conditions in the year 2020, more than a decade after approval, as the "baseline" against
which to assess the traffic and related impacts of the proposed project.'  (*Id.* at p. 1379
. . . .)  'Although "[n]either CEQA nor the CEQA Guidelines mandates a uniform,
inflexible rule for determination of the *existing* conditions baseline" (*Communities For A
Better Environment, supra,* 48 Cal.4th at p. 328, italics added) nothing in the law
authorizes environmental impacts to be evaluated only against predicted conditions more
than a decade after EIR certification and project approval.'  (*Id.* at p. 1380.)"  (*Pfeiffer*,
*supra*, 200 Cal.App.4th at p. 1573.)

---

      **12**  Plaintiffs' reply brief claims the record has "no actual traffic counts."  Plaintiffs
simply ignore the 2004 counts the city has cited.

27

"*Sunnyvale West* is therefore distinguishable from the present case, where the traffic baselines included in the EIR were not limited to projected traffic condition . . . but also included existing conditions . . . ." (*Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1573.) "Moreover, this court acknowledged in *Sunnyvale West* that future conditions may be considered in determining a proposed project's impacts on the environment. . . . '[S]uch discussions may be necessary to an intelligent understanding of a project's impacts over time and full compliance with CEQA.' (*Sunnyvale West, supra,* 190 Cal.App.4th at p. 1381.)" (*Ibid.*) In fact, "CEQA Guidelines expressly provide for consideration of potential future conditions. 'Although "[i]n assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical condition in the affected area . . . ," the EIR must still clearly identify and describe the "[d]irect and indirect significant effects of the project on the environment" and give "due consideration to both the short-term and long-term effects." (CEQA Guidelines, § 15126.2, subd. (a).) Further, "[w]here a proposed project is compared with an adopted plan, the [EIR's] analysis shall examine the *existing physical conditions* at the time the notice of preparation is published, or if no notice of preparation is published, at the time the environmental analysis is commenced *as well as the potential future conditions discussed in the plan.*" (CEQA Guidelines, § 15125, subd. (e), italics added.)' [Citation.]" (*Pfeiffer*, *supra*, 200 Cal.App.4th at pp. 1573–1574.)

*Baseline* "*corrupting*". Plaintiffs claim the EIR compounds its "baseline error" by using its improper baseline as a starting point for the cumulative impacts analysis. As just discussed, however, the EIR properly sets forth a traffic baseline reflecting current conditions. Moreover, as shown in the Appendix C chart, the EIR calculated impacts by *starting with existing conditions* and then forecasting traffic in 2025 both with and without the plan. Those intersections within the plan expected to receive unsatisfactory traffic grades in 2025 because of "direct impacts" or "cumulative impacts" of the plan,

28

were highlighted and singled out for further analysis.[13]  At pages 4-220 to 4-221, the EIR provides two numbers for each at-risk intersection:  the percent of estimated total traffic in 2025 generated by the plan (contribution to total); and the percent of estimated traffic growth, from current conditions to those expected in 2025, generated by the plan (contribution to growth).  The "contribution to growth" figure explicitly measures the plan's impact *against existing conditions*.  Thus, the EIR was able to identify intersections that would be negatively impacted by the plan most directly and those impacted by a combination of the plan and other forces.  It concluded the plan would have a significant impact on seven intersections, but not on the five remaining intersections, based on "examination of the traffic volumes for the traffic movements which determine overall . . . performance at the[] intersections."  The five intersections with insignificant cumulative impacts had the same performance grade in 2025 projections, with or without the plan.

> ### *Parking Baseline*

Despite plaintiffs' contrary assertion, the EIR adequately describes the existing state of both on-street and off-street parking within the project area at pages 4-197 to 4-200.  For instance, the EIR found on-street parking on weekdays at midday to be near capacity.  It also found, referencing a 2002 report parking study, on-street and many off-street parking options were full during performances at Civic Center[14] venues.  The EIR goes on to measure parking shortfalls against current conditions, estimating the project could create parking demand as high a 4,510 spaces during the weekday midday period and 5,640 spaces during the weekday evening period.  (Taking into account, however,

---

[13]  The EIR considered the impacts to 32 intersections and further analyzed the cumulative impacts of the plan on those 12 intersection expected to fail in 2025 if the plan went forward.  The EIR did not, as plaintiffs claim, use a baseline of only those intersections "already" failing.

[14]  There is no indication the EIR's consideration of the Civic Center Garage, just one block outside of the project area (a location the EIR notes), was erroneous.

lower vehicle ownership rates within the area—rates likely to persist under the plan due to the public transit available within the area—the EIR forecasts the plan would generate demand for 2,430 spaces during the weekday midday period and 3,050 spaces during the weekday evening period.)

This baseline is not hypothetical, in contravention of *Communities*, *supra*, 48 Cal.4th at pages 320–321, but based on observation of existing conditions. It is *not* based on "potential new off-street parking." Instead projections of *future demand*, to measure likely impacts, derive from this baseline data.

### *Land Use Baseline*

Plaintiffs also claims the EIR improperly measures the effects of the plan's land use changes against current zoning, not existing conditions. Plaintiffs' have, again, refused to acknowledge portions of the EIR that undermine their position. The EIR, starting at page 4-31, in fact summarizes actual, existing land use in addition to current zoning. It also reports on expected impacts to existing land use. For example, it projects 4,400 new net housing units and 1.8 million square feet of new non-residential development. The EIR then discusses land use impacts sub-area by sub-area. For instance, for the Market Street/Van Ness Avenue sub-area, the EIR states "[t]he most noticeable change would be the introduction of residential towers . . . of up to 400 feet." It notes "[a]lthough current height limits allow buildings up to 320 feet . . . the existing scale of buildings at this intersection is mostly 8 to 12 stories (up to about 150 feet)" with two taller outliers. The EIR therefore does not conceal the fact that the plan will permit residential towers where lower structures currently exist.

Not only does the EIR measure permitted changes in land use against present use, it would not be inappropriate, as plaintiffs assert it would be, to compare proposed zoning to current zoning, which, as noted, the EIR also does. After all, changes to zoning, not the construction of a particular development, is the core of the Market and Octavia area plan. Thus, in this sort of case, current zoning is not a hypothetical measure of existing

conditions at a project site; current zoning *is* the existing condition and therefore a proper baseline. (*Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 985, italics omitted ["when a proposed amendment to a general plan is the subject of an initial study, . . . the question is the potential impact on the existing environment of changes in the plan which are embodied in the amendment"]; cf. *Communities, supra*, 48 Cal.4th at pp. 318, 321–322 [using a boiler's permitted emissions as baseline instead of actual emissions was error when thrust of project was modification of the boiler, not changing permit rules]; but see *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [reaching a different conclusion when EIR for proposed general plan amendments failed to make any comparison to existing conditions].)

### *Transit and Other Baseline Issues*

Plaintiffs have also asserted the use of year 2025 projections as a baseline for assessing public transit, air quality, noise, and growth impacts was improper. But plaintiffs never challenged the baseline for air quality, noise, and growth impacts in the trial court and have therefore waived these arguments. (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804.) Plaintiffs' purport to cite to pages of their trial court briefing in which they raise these claim, but the cited pages only raise an issue with the transit baseline, not the others.

As for the public transit baseline, the EIR in fact lays out the *then existing*, 2004 state of transit starting at page 4-185. From this data, the EIR, starting at page 4-223, extrapolates transit data for the year 2025 with and without the plan as a means of finding the changes to existing conditions as a result of the plan, just as with the traffic analysis. Thus, the EIR discloses such metrics as demand, capacity, and utilization for 2004 conditions and those expected in 2025. As with the traffic baseline, this is a situation where an intelligent understanding of impacts requires an analysis of likely future conditions in the context of current ones, just as the EIR does here. It would be absurd to

31

ask the city to hypothesize the impacts of a long-term zoning plan taking hold *immediately*. When an area plan takes a long view of city planning, the analysis of the plan's impacts should do so as well. (*Pfeiffer*, *supra*, 200 Cal.App.4th at pp. 1572–1574.)

Implicitly conceding the transit baseline does address existing conditions, plaintiffs also take issue with the transit baseline's assessment that, *in 2004*, the Market/Octavia area was "well-served." Whatever this amorphous conclusion may mean, plaintiffs say it is unwarranted because the city's own data showed transit delays and overcrowding on buses as a result. The data the city cites, however, comes from an old August 2001 report and pre-dates the EIR. Plaintiffs then cite a chart in the EIR that supposedly shows Muni lacks capacity to serve existing, 2004 needs. Yet the chart plaintiffs cite, showing loads on North/South Muni lines, belies their claim, showing all Muni lines operating at 58 percent to 100 percent of capacity (two lines were considered at capacity, not over it). At bottom, the EIR has provided a sufficient transit baseline and plaintiffs' claimed defects are illusory.

### 4. EIR's Analysis of Environmental Impacts

"An EIR shall identify and focus on the significant environmental effects of the proposed project." (Guidelines, 15126.2, subd. (a).) A significant environmental effect is " 'a substantial, or potentially substantial, adverse change in the environment.' (Pub. Resources Code, § 21068; see also Guidelines, § 15382.) ' "Environment" means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.' (Pub. Resources Code, § 21060.5; see also Guidelines, § 15360.)" (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473, fn. omitted.)

Even if a project's impact may be "individually limited" this impact may be "cumulatively considerable," and an EIR "shall discuss" these impacts. (Pub. Resources Code, § 21083, subd. (b)(2); Guidelines, §§ 15065, subd. (a)(3), 15130, subd. (a).)

32

" '[C]umulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Pub. Resources Code, § 21083, subd. (b)(2); Guidelines, § 15065, subd. (a)(3).)

An agency decision to not identify an impact as significant is reviewed for substantial evidence. (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 281-282.)

### *Traffic Impacts*

Starting with traffic impacts, plaintiffs claim the EIR understates the project's overall impact on traffic. They claim a contradiction between, on the one hand, San Francisco County Transportation Authority (SFCTA) figures estimating 60.8 percent of all trips (both those internal to the city and those passing through) will be by car and, on the other hand, the EIR's claim that the project will generate approximately 35,970 daily "person trips" but only 10,955 "vehicles trips." Plaintiffs divide 10,955 into 35,970 and get 30.45 percent trips by car. But plaintiffs are comparing apples and oranges. As noted on page 4-208 of the EIR, one vehicle trip can amount to more than one person trip. Moreover, the SFCTA's numbers are citywide and do not relate to goals and expectations for the Market/Octavia plan area. As the Market/Octavia area is to have reduced parking and proximity to public transit, the EIR contemplates fewer vehicle trips in that area than in other parts of the city.

Plaintiffs also fault the EIR for not finding a significant traffic impact at the Van Ness/Market intersection despite stating there would be "a *63% increase* in traffic." Plaintiffs mischaracterize the EIR. It actually shows traffic at the intersection would, with the plan, undergo an overall increase of only 355 vehicles during peak weekday afternoon hours, or a *6 percent* increase over the 5,610 vehicles at present. The 63 percent figure refers not to the overall increase, but only to the portion of that increase, 225 vehicles our of 355, due to the plan. Put another way, the plan would contribute only

33

4 percent of the total expected traffic volume at the intersection in 2025. Furthermore, the EIR notes that the Van/Ness Market intersection would operate at the same poor "E" Level of Service (delay per vehicle) whether with *or without* the plan. Plaintiffs have not challenged the Level of Service delay-per-vehicle grading rubric as a reasonable measure of impact, nor the underlying Wilbur Smith traffic study's assertion that "operational impacts on signalized intersections are considered significant if project-related traffic causes the level of service to deteriorate from LOS D or better to LOS E or F, or from LOS E to LOS F."

Plaintiffs cannot base a substantial evidence attack on the whole of the city's commissioned traffic analysis with such slender and unfounded complaints.

Nor can plaintiffs fault the city for using computerized SFCTA travel demand forecasting model, which incorporates data from 766 city-wide Transportation Analysis Zones, to predict cumulative impacts to future traffic. *Rialto, supra*, 208 Cal.App.4th 899, ratified a similar approach and forecloses plaintiffs' complaint that the city should have based its impacts analysis on different data, such as a separate list of all projected future projects.

### *Transit Impacts*

Plaintiffs also challenge the EIR's conclusion of no "significant adverse impact on Muni service." Plaintiffs again point to purported contradictions in the EIR to suggest the EIR's conclusions are not supported by substantial evidence.

Plaintiffs first highlight the EIR's claim of just 205 additional Muni riders under the plan, despite the plan's likely addition of thousands of new area residents. Plaintiffs imply this figure is per day, juxtaposing it with projected *daily* person trips, but fail to note this 205 figure is actually *per hour* and represents only an increase in ridership at selected outbound rides at "screenlines." Thus, the screenline analysis, just one of the analyses related to Muni impacts, explicitly excludes "many transit trips that would travel to/from the Project Area [and] . . . not cross any of the screenlines." There is nothing

34

irrational about the 205 figure or the EIR's screenline analysis, especially given the EIR includes a "corridor" analysis: "a secondary analysis" undertaken precisely because the screenline analysis was not capturing project-generated trips sufficiently.

Plaintiffs further fault the city for ignoring SFCTA's projection that, across all San Francisco, the percentage of trips on public transit would increase from 17.2 percent in 2000 to 19.6 percent in 2025. The EIR, however, actually operates on the assumption that an even higher percentage of area trips, 21 percent, would be by transit during peak hours. This is because the EIR starts with the SFCTA report, but applies its general principals to the planned Market and Octavia area.

Plaintiffs' citation to *San Franciscans for Reasonable Growth v. City and County of San Francisco*, *supra*, 151 Cal.App.3d at page 78, though it notes "cattle car" status on Muni is an impact to address, has no bearing on the adequacy of the EIR's transit analysis in this case. In that case, the city turned a blind eye to contemporaneous development projects that would, in combination with the high rise under consideration, likely create a significant impacts on Muni, impacts the city's EIR did not address. Here, the EIR, at pages 4-224 to 4-228 justifies its conclusion of no significant impact, explaining the projected increase of riders at screenlines and corridors (with the plan in 2025, as compared to without the plan in 2025) would not result in Muni exceeding its capacity utilization standard.

### Parking Impacts

There is no dispute the plan would, in all likelihood, create a parking shortfall. As already mentioned, the EIR estimates parking shortfalls as high a 4,510 spaces during the weekday midday period and 5,640 spaces during the weekday evening period, or 2,430 spaces during the weekday midday period and 3,050 spaces during the weekday evening period if lower vehicle ownership rates persist. It weighs these shortfall numbers (both without and with reduced vehicle ownership) against three projected supply scenarios under the plan: no new parking spaces (0 new spaces), creation of the maximum allowed

35

spaces according to zoning without conditional use permits (2,080 new spaces), and creation of the maximum spaces with conditional use permits (3,160 spaces). Under these three scenarios, there would be a shortfall of 1,350 to 4,510 spaces on weekdays at midday and 2,480 to 5,640 spaces on weekdays at evenings. If reduced vehicle demand occurs, the shortfall reduces to -730 (a surplus) to 2,430 spaces at midday and -110 (a surplus) to 3050 spaces at evening. The EIR also makes clear there would be a parking shortfall even if the city applied its general requirement of one parking space per residential unit.

The EIR acknowledges the potential shortfall, but states while "[p]arking deficits may be an inconvenience to drivers," they "are not considered significant physical impacts on the environment." Indeed, the Court of Appeal for this district has held, standing alone, "[t]he social inconvenience of having to hunt for scarce parking spaces is not an environmental impact." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 697 (*Downtown Plan*); see also *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 917 (*Long Beach*).) This court found no requirement for "an EIR to identify specific measures to provide additional parking spaces in order to meet an anticipated shortfall in parking availability." (*Downtown Plan*, *supra*, 102 Cal.App.4th at p. 697.) Public Resources Code section 21060.5, which plaintiffs cite, does not say otherwise. It merely defines the term "environment" to mean "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5.)[15]

---

[15] Nor do we find the recent case *Taxpayers for Accountable School Bond Spending v. San Diego Unified School District* (2013) 215 Cal.App.4th 1013, (*Taxpayers*) helpful to plaintiffs. That case "disagree[d]" with the "broad statement" in *Downtown Plan* "that a parking shortage is merely a social inconvenience and can never constitute a primary physical impact on the environment." (*Taxpayers*, at p. 1051.) Yet

To be sure, however, an EIR must address secondary physical impacts triggered by a social impact, which, in the case of parking, might mean physical impacts on traffic and air quality. (*Downtown Plan*, *supra*, 102 Cal.App.4th at p. 697; *Long Beach*, *supra*, 176 Cal.App.4th at p. 917.) The EIR, however, does weigh increased traffic and reduction in air quality due to some circling cars against the likelihood that many would take note of the constrained parking situation and take public transit or other modes of transport. The EIR concludes, quoting from the Wilbur Smith transportation study, "any secondary environmental impacts which may result from a shortfall in parking . . . would be minor, and the traffic assignments used in the transportation analysis, as well as in the associated air quality, noise and pedestrian safety analyses, reasonably addresses potential secondary effects." Plaintiffs ignore this conclusion of the city's experts (Guidelines, § 15384 [allowing reliance on expert opinion]; *Downtown Plan*, *supra*, 102 Cal.App.4th at p. 681) and offer no viable challenge to it, and no evidence to dispute it. Thus, there is no evidence on which to base a fair argument that anticipated parking

the court also explained *Downtown Plan* as dealing with the precise "special circumstances" in San Francisco (the setting for this case) where there is: "a strong public policy, reflected in a city ordinance, against providing private off-street parking to encourage the use of public transit." (*Taxpayers*, at p. 1051; *ibid.* & fn.24 ["the Project in this case is not located in a downtown area, and there is no City ordinance absolving a project from providing off-street parking. On the contrary, City apparently has an ordinance generally requiring projects to provide off-street parking"]; see also Cal. Code Regs. tit. 14, § 15064, subd (b) ["an activity which may not be significant in an urban area may be significant in a rural area"].) We see no reason to depart from *Downtown Plan* in this case.

Furthermore, in *Taxpayers*, the school district, crucially, did not obtain a useful measure of parking supply and likely increased parking demand in the project area, and so could not hope to meaningfully articulate impacts, direct or indirect, of a parking shortfall. (*Taxpayers*, 215 Cal.App.4th at p. 1054 ["because District did not have sufficient information relating to the Project's impact on parking and therefore could not adequately consider the potential significance of the Project's impact on parking, District abused its discretion"].) As discussed above, the city fully disclosed the expected parking shortfalls and surpluses for various scenarios under the plan.

shortfall will cause significant impacts. (See *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934–935 ["Tracy First simply makes the bare assertions that the opinion of the City's expert that the project would not result in wasteful, inefficient, and unnecessary consumption of energy was not supported by facts"]; cf. *Long Beach*, *supra*, 176 Cal.App.4th at p. 917 [petitioner "provided no facts to support its hypothesis that parking is scarce"].)

### *Growth Impacts*

Plaintiffs' challenge to the analysis of impacts from growth in the plan area is difficult to parse and contains no reasoned explanation of how the EIR violates CEQA— plaintiffs cite only general CEQA guidelines and provide not a single case cite. On this basis alone we reject plaintiffs' growth argument. (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1215 ["Contentions are waived when a party fails to support them with reasoned argument . . . ."].) In any event, it appears plaintiffs are distressed that the EIR considers the plan's predictably light impact on *citywide* growth, but excludes analysis of growth limited to the plan area. This assertion, however, is without basis, as the EIR, starting at page 4-66, analyzes area-specific growth in population, housing, and employment. Plaintiffs have not presented a challenge to that analysis.

### *Cumulative Analysis*

According to plaintiffs "perfunctory cumulative analyses are tacked on to the no-impact findings for the various categories" of potential impacts. We have found no error in any finding of no impact, and so there can be no shortcoming in the cumulative impact analysis based upon the city's alleged misperception of the project's direct impacts. (See *Citizens for East Shore Parks v. State Lands Com.*, *supra*, 202 Cal.App.4th at pp. 565–566 ["the EIR did not need to consider the cumulative impact of [water] discharges because they were not 'effects of [the] individual project' under consideration"].) To the extent plaintiffs contend the city should have analyzed other projects in its cumulative

38

impacts analysis, plaintiffs merely list these projects in their opening brief and offer no explanation of their relevance. This does not raise a sufficient challenge to the adequacy of the analysis. (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 877–878 [in the cumulative impacts context, a " ' "reviewing court is not required to make an independent, unassisted study of the record in search of error . . .' " . . . and may treat an issue as waived 'when an appellant makes a general assertion, unsupported by specific argument' "]; *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners*, *supra*, 18 Cal.App.4th at p. 749 [petitioners "do not identify, or even suggest, any manner in which the omission of more detailed information underlying the Board's conclusions on [cumulative impacts] mislead the agency or the public, omitted or understated any problem, or was prejudicial in any way"].)**[16]**

---

**[16]** In their petition for rehearing, plaintiffs, for the first time, assert the city failed to conduct *any* cumulative impact analysis, at least for certain types of impacts. Plaintiffs briefing on appeal, while cataloging the various "perfunctory" cumulative impact analyses in the EIR (noting cumulative impact analyzes *were present* for at least land use and zoning; population, housing, and employment; growth; visual quality; wind; historic resources; transit; air quality; noise; and public facilities and services), did assert in passing (in parentheticals) that cumulative impacts for parking and open spaces were "not analyzed." Plaintiffs, however, made no argument based on the lack of any given analysis. Plaintiffs have thus waived this claim by failing to adequately brief it on appeal. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]' "]; *Friends of the Eel River v. Sonoma County Water Agency*, *supra*, 108 Cal.App.4th at pp. 877–878 [in the cumulative impacts context, a " ' "reviewing court . . . may treat an issue as waived 'when an appellant makes a general assertion, unsupported by specific argument' "].) Moreover, plaintiffs' cumulative impacts argument to the trial court focused entirely on the adequacy of the various cumulative impact analyses, not the outright omission of any of them. For this additional reason, the omission argument is barred. (*A Local & Regional Monitor v. City of Los Angeles*, *supra*, 12 Cal.App.4th at p. 1804.) We have not investigated, and need not investigate, whether this issue was properly raised in during the administrative process. (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [" ' "It was never contemplated that a party to an administrative hearing should withhold any defense

39

### 5.    Mitigation of Impacts

"An EIR shall describe feasible measures which could minimize significant adverse impacts . . . ."  (Guidelines, § 15126.4(a)(1).)  "If a mitigation measure would cause one or more significant effects in addition to those that would be caused by the project as proposed, the effects of the mitigation measure shall be discussed but in less detail than the significant effects of the project as proposed."  (Guidelines, § 15126.4, subd. (a)(1)(B).)

#### *Community Improvements Program*

Plaintiffs' first argument concerning mitigation of impacts stems from the Community Improvements Program (CIP) the city adopted in conjunction with approving the Market and Octavia Area Plan.  The CIP seeks to raise $261 million for improvement within the plan area—such as open spaces; pedestrian, vehicle, transit, and bicycle amenities; and childcare and recreational facilities—by charging development fees of $10 per square foot for residential development and $4 per square foot for non-residential.  The city's ordinance adopting the CIP's fundraising mechanism, however, carefully noted the city was "not committing to the implementation of any particular project" as there would likely be the need for proposed projects to undergo further design and environmental review.  The CIP itself acknowledges the need for further environmental review, acknowledging the city will have to handle the "soft costs" for that review.

The CIP, according to plaintiffs, concedes the plan has impacts, impacts the EIR ignores and fails to mitigate.  The CIP, in justifying its fundraising, states, for example, the transition of Western SOMA into a mixed-used neighborhood with some potentially high-density parcels "will create an exponentially greater demand on city infrastructure

. . . or make only a perfunctory or 'skeleton' showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court." ' "].)

40

systems.  The Plan supports this type of development, but must also plan for the necessary infrastructure."

Had the CIP proposed mitigations to significant environmental impacts, an EIR would have needed to address those impacts and measures.  (*California Native Plant Society v. County of El Dorado* (2009) 170 Cal.App.4th 1026, 1059 (*CNPS I*) ["fee program does not insulate the project from CEQA review"].)  But unlike in *CNPS I*, the city here prepared an EIR.  That EIR evaluated the project and its impacts, and did not require the so-called mitigation programs outlined in the CIP.  Plaintiffs quote off-hand statements in the CIP about "impacts," but do not show these impacts are legally significant or that the city's EIR failed to properly address them.  (See *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1517 [the EIRs "do not identify impacts on open space as a significant environmental effect.  CEQA thus did not require measures to alleviate threats to open space as such."]; *Long Beach*, *supra*, 176 Cal.App.4th at p. 915 [non-significant impacts need not be analyzed].)  They have put the cart before the horse, assuming the CIP must be targeted at significant, CEQA-level impacts simply because it aims to facilitate implementation of the underlying project.

Thus, for example, plaintiffs fault the CIP for not going far enough to mitigate transit impacts—the CIP fails to call for new buses—but fail to show how the EIR's conclusion on transit impacts is wrong.  In fact, as we have discussed, the EIR transit impact analysis is adequate.

Moreover, plaintiffs fault the CIP for suggesting new projects, not considered in the EIR, that they claim will "remove parking" and cause other impacts, but plaintiffs do not confront the fact that, as noted in the CIP, "these projects are placeholders that require further community vetting, engineering, and environmental review.  Projects described here that have not completed environmental review are placeholders used to estimate project costs.  Additionally, projects may be substituted based on community,

41

city agency, and board recommendation." And as already stated, the city ordinance approving the CIP reiterated the "Board of Supervisors is not committing to the implementation of any particular project."

We shall not doom the city's area plan simply because it or others have made informal, unapproved, un-reviewed, hypothetical suggestions for new development and projects within the plan area. If we did otherwise, we would not respect the tiering process the city has properly chosen for environmental review. (See *In re Bay-Delta*, *supra*, 43 Cal.4th at pp. 1174–1175 ["Under CEQA's tiering principles, it is proper for a lead agency to use its discretion to focus a first-tier EIR on only the general plan or program, leaving project-level details to subsequent EIR's."].)

### *Traffic Mitigation*

According to plaintiffs, the EIR offers no proposed mitigation for four admittedly impacted intersections except changes to traffic signal timing, changes which the EIR says may not be feasible. In fact, the EIR states, for these trouble intersections, "[i]mplementation of signal timing changes would be dependent upon an assessment of transit and traffic coordination . . . to ensure that the changes would not substantially affect Muni bus operations, signal progressions, pedestrian minimum green time requirements, and programming limitations of signals. [¶] As the feasibility of the signal timing changes has not been fully assessed, the potential for a significant and unavoidable impact [from adopting the plan] would still exist." The city ultimately committed itself, in its CEQA findings, to implementing the signal changes if possible. To be conservative, however, the city assumed the changes would not be possible, and concluded, regardless, to move forward, as set forth in its statement of overriding considerations.

While ideally the city would have determined the feasibility of signal changes, that is not what CEQA requires in this case. CEQA need not "prevent project approval in situations in which the formulation of precise *means* of mitigating impacts is truly

42

infeasible or impractical at the time of project approval. In such cases, the approving agency should commit itself to eventually working out such measures as can be feasibly devised, but should treat the impacts in question as being significant at the time of project approval." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028, italics added.) At the end of the day, "[i]f the EIR finds that there are significant impacts for which no mitigation measures are feasible, [the approving agency] must adopt a statement of overriding considerations before approving the project. (§ 21081, subd. (b); Guidelines, § 15093.)" (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 724.) The city did not ignore the traffic impacts at these intersections. Rather, it informed the public of unavoidable impacts, committed itself to a plan of mitigation, and made it clear, in its statement of overriding consideration, that it would move forward with the project *even if the mitigation, when attempted, were a failure*. CEQA's core informational purpose was satisfied. (Cf. *In re Bay-Delta*, *supra*, 43 Cal.4th at p. 1162 ["The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions . . . ."].) The city should not be faulted for requiring an attempt at mitigation instead of simply giving approval without the requirement, a course of action that would leave the project's known impacts unaddressed.

### *Wind and Shadow*

The EIR does not, as plaintiffs contend, improperly defer mitigation of wind impacts by stating, on page 4-135, "[a] determination of wind impacts would be made at a project level . . . as specific development proposals are made." Tiering (see *In re Bay-Delta*, *supra*, 43 Cal.4th at pp. 1174–1176) is especially appropriate in this instance, where, as stated on page 4-134 of the EIR, "wind impacts from new construction are site- and design-specific, i.e., ground level impacts of construction of a building of a certain size is more dependent on design factors such as exposure, massing and orientation than square footage." (Italics omitted.) Plaintiffs do not challenge this conclusion.

In any case, the EIR proposes mitigation measures to reduce the impacts of new construction so ground winds speeds would not ordinarily exceed the "comfort level" of 11 miles per hour. Exceptions could be made in some circumstances, but in no event could ground wind speeds "reach or exceed the hazard level of 26 mph for a single hour of the year." This 26 miles per hour threshold is also what the EIR determines, on page 4-133, is the point at which wind would produce a significant environmental impact requiring mitigation.[17]

Finally, plaintiffs fault the EIR for not proposing mitigation for acknowledged shadow impacts potentially resulting from new residential high rises. Yet the EIR contains a multi-faceted approach to mitigating shadow impacts. First, it relies on San Francisco Planning Code section 295 of the city's planning code, which prohibits shadows on any open space controlled by the Recreation and Park Commission if the shadows would cause significant, adverse impact on use of the space. (S.F. Planning Code, § 295.) Second, for open spaces not under section 295's protection, it requires proposed buildings over 50 feet tall to be shaped to minimize shadows. Yet the EIR acknowledges these measures may not be enough, and, as with traffic measures, the city adopted its findings and statement of overriding considerations knowing the full impact of its plans.

---

[17] Though more of an "impact" argument than a "mitigation" argument, plaintiffs complain the 26 miles per hour threshold is not correct and cite provisions of the city's planning code, including section 148, which purportedly set forth the more restrictive 11 miles per hour comfort level as the threshold of significant impact. The planning code, to be sure, adopts the 11 miles per hour comfort level, but also permits exceptions, as would the EIR, for some buildings to create up to 26 miles per hour winds. (S.F. Planning Code, § 148.) Nowhere does the code pick either the comfort level or the hazard level as an environmentally significant threshold. Nowhere do plaintiffs articulate why a 26 miles per hour threshold, permitted by the city already under section 148, is deficient.

44

### 6. Alternatives

"An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. . . ."  (Guidelines, § 15126.6, subd. (a).)

Plaintiffs assert the EIR's analysis of alternative options is inadequate because it does not evaluate an alternative that reduces the project's wind, shadow, and traffic impacts.  The EIR, however, not only analyzes a no project alternative, it also analyzes a "Reduced Height/Reduced Density" alternative, at page 7-9, specifically aimed at providing an option with, among other things, reduced shadow, wind, and traffic impacts.  The EIR discusses these reduced impacts at page 7-11 (shadows and wind) and page 7-12 (traffic).

"An EIR need not consider every conceivable alternative to a project." (Guidelines, § 15126.6, subd. (a); *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 196.)  Rather, it is sufficient to consider a "range of reasonable alternatives" to a proposed project to "foster informed decisionmaking and public participation."  (Guidelines, § 15126.6, subd. (a).)  Plaintiffs conclusorily asset the EIR should have analyzed other alternatives but do not suggest a single alternative plan the city might have considered that would have lessened significant environmental impacts associated with the project.  An agency's selection of alternatives to consider " 'will be upheld, unless the challenger demonstrates "that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives." [Citation.]' [Citation.]"  (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 414.)  Plaintiffs have not met their burden.

Plaintiffs nonetheless assert the city gave short-shrift to the alternatives analysis because the planning department was the project "author, sponsor, *and* environmental

review agency" and because the city's Board of Supervisors did not make their own independent findings about alternatives. There was nothing problematic, however, with the Board of Supervisors adopting the planning department's recommendations. (*Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 528 ["We do not disagree with the idea that an elected body can adopt the findings and explanations of the lower body."].)

## 7. CEQA Findings and Statement of Overriding Considerations

"No public agency shall approve or carry out a project for which an EIR has been certified which identifies one or more significant environmental effects of the project unless the public agency makes one or more written findings for each of those significant effects, accompanied by a brief explanation of the rationale for each finding. The possible findings are: [¶] (1) Changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen the significant environmental effect as identified in the final EIR. [¶] (2) Such changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the finding. Such changes have been adopted by such other agency or can and should be adopted by such other agency. [¶] (3) Specific economic, legal, social, technological, or other considerations, including provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or project alternatives identified in the final EIR." (Guidelines, § 15091, subd. (a).) CEQA findings "shall be supported by substantial evidence in the record." (Guidelines, § 15091, subd. (b).)

CEQA additionally requires "the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits, including region-wide or statewide environmental benefits, of a proposed project against its unavoidable environmental risks when determining whether to approve the project. If the specific economic, legal, social, technological, or other benefits, including region-wide or

46

statewide environmental benefits, of a proposed project outweigh the unavoidable adverse environmental effects, the adverse environmental effects may be considered 'acceptable.' " (Guidelines, § 15093, subd. (a).)  When this occurs, "the agency shall state in writing the specific reasons to support its action based on the final EIR and/or other information in the record.  The statement of overriding considerations shall be supported by substantial evidence in the record."  (Guidelines, § 15093, subd. (b).)

Plaintiffs contend the city's findings and statement of overriding considerations are not based on substantial evidence.  In particular, they claim the city has not pointed to substantial evidence supporting the conclusion that "economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or project alternatives identified in the final EIR," such as keeping Hayes Street as one-way. (Guidelines, § 15091, subd. (a)(3); Pub. Resources Code, § 21081, subd. (a)(3).)

Yet the city provided a host of reasons in its CEQA findings to reject the Hayes Street "one-way" traffic mitigation proposal, discussed in detail at pages 5-14 to 5-17 of the draft EIR:  the one-way street would "constrain[] pedestrian crossing at key intersections including Hayes and Gough, and Gough and Fell, creat[e] conditions for high-speed automobile travel through key neighborhood intersections; creat[e] an unfriendly pedestrian environment due to noise and pollution; and reduc[e] the tendency for residents to walk for their daily needs."  The city concluded a one-way Hayes street would be infeasible:  economically, because it would thwart development of the desired commercial district in that area; and socially, because it would reduce safety and quality of life for pedestrians.  These conclusions are supported in part by public comments from stakeholders.

The city's decision to reject the Hayes Street traffic mitigation measure as infeasible, and, in fact, its myriad of other decisions—reflected in it 42-page findings and statement of overriding considerations—to proceed with the Market and Octavia plan despite known impacts, reflects not a failure to comply with CEQA but a rational

47

balancing of interests, albeit in a way plaintiffs dislike. (See *California Native Plant Soc. v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1001–1002 (*CNPS II*).) *CNPS II* holds that an alternative or a mitigation measure may be infeasible because it is impractical or undesirable from a policy standpoint, " 'to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors.' " (*Id.* at p. 1001.) The appellate court approved a city's infeasibility findings "based on policy considerations, particularly the City's interest in promoting transportation alternatives as well as access to its open space for persons with disabilities." (*Ibid.*)

As in *CNPS II*, the "appellants' assertion represents nothing more than a 'policy disagreement with the City.' " (*CNPS II*, *supra*, 177 Cal.App.4th at p. 1001.) "At bottom, appellants' disagreement is 'with the nature of the balance struck between . . . interests.' [Citation.] This is not a case involving straightforward questions of legal or economic infeasibility. (See, e.g., *Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 601 . . . [no economic infeasibility]; *id.* at p. 602 [no legal infeasibility].) Arguably, such cases may present brighter lines for judicial review. Whether or not that is so, this much is clear: it is wholly improper for us to 'arrogate to ourselves a policy decision which is properly the mandate of the City.' [Citation.] In this case, the City's determination was consistent with permissible statutory factors. ([Pub. Resources Code,] § 21081, subd. (a)(3) ['social . . . or other considerations'].) And it was justified under relevant case law . . . ." (*Id.* at pp. 1001–1002; see also *Rialto*, *supra*, 208 Cal.App.4th 899, 949 ["a lead agency may reject an alternative as infeasible because it cannot meet project objectives"].)

Furthermore, petitioner's contention that the statement of overriding considerations needed to be a separate, stand-alone document is meritless. (*Towards Responsibility In Planning v. City Council* (1988) 200 Cal.App.3d 671, 683 ["City's statement of overriding considerations referred to the conclusions contained in the final

report of the economic development task force . . . . It is entirely proper for an agency to rely upon studies and reports prepared for a previous step in the approval process."].)[18]

### 8. Supplementation of the Record

The final issue on appeal is the trial court's May 12, 2009 order granting the city's motion to supplement the CEQA administrative record.

Plaintiffs claim the trial court granted the city leave to file 4,000 additional pages of administrative record without reviewing the then-current record and the city's proposed supplement, and without making specific findings that the supplement was relevant and truly part of the record, and without allowing plaintiffs to add further documents to the record if necessary. Believing the trial court wrongly granted the motion to supplement, plaintiffs fear they may ultimately be unfairly required to pay the cost of preparing copies of the supplement (as requested in a bill of costs the city has filed). The city's bill of costs, though referenced in the register of actions, is not the appellate record, nor is any order that may obligate plaintiffs to pay these costs.

On this record, we cannot resolve plaintiffs' challenge. First, without an order to pay costs before us, our review is irreparably hindered. (See *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 [review denied when appellant failed to provide, among other things, a copy of the ordered challenged].) Additionally, plaintiffs have not demonstrated an injury ripe for review. (See *Lazan v. County of Riverside* (2006) 140 Cal.App.4th 453, 464 [the superior court gave "permission to apply

---

[18] Plaintiffs raised other arguments about the timing of the findings and statement in their petitioner for rehearing. To the extent these issues were not properly raised beforehand, they have been forfeited. (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1257, fn. 12.) Otherwise, they are rejected. We have been cited no authority prohibiting the city from adopting findings and a statement of overriding considerations contemporaneously with an EIR.

for attorney's fees" but the party "has yet to file a request" so the issue "is not ripe for appeal"].)[19]

Moreover, although plaintiffs challenge the trial court's *procedures*, plaintiffs have not directed us to a single irrelevant or otherwise improper document in the city's supplement. An appellant must not only show how the trial court erred, but how its error was prejudicial. (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) "[W]e cannot presume prejudice and will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice. (Cal. Const., art. VI, § 13; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 . . . ; *Taylor v. Varga, supra,* 37 Cal.App.4th at p. 759.) Just because this case involves CEQA, in which reversal of *agency* action may be appropriate if an "*agency* has not proceeded in a manner required by law" (*Vineyard*, *supra*, 40 Cal.4th at p. 426), does not relieve plaintiffs of their obligation to show prejudice from *court* orders. (See *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 71 ["When a party seeks review of a trial court's determinations regarding the scope of the administrative record, that party bears the burden of demonstrating that the trial court committed error."].)

---

**19** In fact, plaintiffs' petition for rehearing discloses the trial court eventually granted plaintiffs' motion to strike costs related to the supplemental record, and that the city has an appeal on file (case No. A135512) challenging that order.

### III.    DISPOSITION

The judgment is affirmed.  Respondent to recover its costs on appeal.

 

_____

Banke, J.

We concur:

_____

Margulies, Acting P. J.

_____

Dondero, J.